IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

| | |
|---|---|
| JOCELYN O. GENTRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 22-cv-1235-TMP |
| | ) |
| KILOLO KIJAKAZI, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

_____

ORDER AFFIRMING THE COMMISSIONER'S DECISION
_____

On October 27, 2022, Jocelyn O. Gentry filed a Complaint seeking judicial review of a Social Security decision.[1] (ECF No. 1.) Gentry seeks to appeal a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II disability benefits. (ECF No. 15 at 1.) For the following reasons, the decision of the Commissioner is AFFIRMED.

I. BACKGROUND

On July 17, 2019, Gentry protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 404-434,

---

[1] After the parties consented to the jurisdiction of a United States magistrate judge on January 19, 2023, this case was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 14.)

and a Title XVI application for supplemental security income (R. at 15.) The application, which alleged an onset date of July 31, 2015, was denied initially and on reconsideration. (Id.) Gentry then requested a hearing, which was held before an Administrative Law Judge ("ALJ") over telephone on June 17, 2021. (Id.)

After considering the record and the testimony given at the hearing, the ALJ used the five-step analysis to conclude that Gentry was not disabled. (R. at 27.) At the first step, the ALJ found that Gentry has not engaged in substantial gainful activity since the alleged onset date of July 31, 2015. (R. at 18.) At the second step, the ALJ concluded that Gentry had the following severe impairments:

> Cervical and lumbar degenerative disc disease, status-post T12-L4 fusion; obesity; left knee chondromalacia of patellofemoral joint and synovitis, status-post left knee arthroscopy with chondral debridement of patella and trochlea and partial synovectomy; right shoulder partial thickness rotator cuff tear; and status-post right knee arthroscopy with debridement of articular cartilage of patella . . . .

(Id.) At the third step, the ALJ concluded that Gentry's impairments did not meet or medically equal, either alone or in the aggregate, the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) Accordingly, the ALJ had to next determine whether Gentry retained the residual functional capacity ("RFC") to perform past relevant work or could adjust to other work. The ALJ found that Gentry:

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she requires a sit/stand option every 30 minutes. She could do occasional bending, stooping, kneeling, crouching, or crawling and climbing of ramps/stairs. She should never climb ladders, ropes, or scaffolds. She could occasionally reach overhead with the bilateral upper extremities. She should have no concentrated exposure to temperature extremes and no work at unprotected heights or around unguarded moving machinery.

(R. at 21.) Pursuant to 20 C.F.R. § 404.1567(b), light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Additionally, light work includes jobs "requir[ing] a good deal of walking or standing, or [that] involve[] sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

In reaching the RFC determination, the ALJ discussed Gentry's testimony and the medical evidence in the record. The ALJ summarized Gentry's testimony as follows:

> [Gentry] testified that she relies on family to do household chores, shopping, cooking, and assist with her personal care. She said if she does laundry or loads the dishwasher, she has problems the next day. She said she must constantly change positions every ten to fifteen minutes and she is always tired. She rated her pain as an eight before medications and a six or seven after medications.

(R. at 22.) The ALJ concluded that "[Gentry's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Gentry]'s statements concerning the

- 3 -

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Id.)

The ALJ then considered Gentry's medical records and treatment history, as well as the opinions of a number of her doctors. Starting in 2017, regarding her spine, the ALJ found that Gentry:

> has a history of neck pain without radiculopathy. A cervical spine magnetic resonance imaging (MRI) in October 2017 demonstrated mild degenerative disc disease and a small disc bulge on the left at C6-7 with no significant stenosis. On examination in November 2017, bilateral extremities had no wasting of muscles, 5/5 strength, intact sensation, and full range of motion with normal stability in the left shoulder, elbow, and wrist. In December 2017, Peter Gardner, M.D., concluded [Gentry] was disabled and walked with a cane due to back and neck pain and unable to do work activities for Families First and noted [Gentry] was pending a new treatment. . . .
>
> Examination in February 2018 showed normal lordosis and alignment on the cervical spine with tenderness to palpation also noted on the lumbar spine. There was no subluxation and normal strength and tone. Motor examination and reflexes were normal in the upper and lower extremities. In April 2018, John Nwofia, M.D., indicated the pain was worse with walking or bending, sit to stand, and lifting. He said frequent position changes and rest would help. This opinion is somewhat persuasive, as it is consistent with the evidence from that period. On examination, she had positive left straight leg raise with moderate to severe findings in the low back on the left but normal on the right. However, imaging showed mild findings on the thoracic spine and mild to moderate findings with intact hardware on the lumbar spine. [Gentry] had remote lumbar surgery for scoliosis with T12-L3 lateral stabilization and fusion. Subsequently she underwent lumbar decompression, stabilization, and fusion, which improved symptoms.

> Still, she reported chronic low back pain. She is diagnosed with postlaminectomy syndrome of the lumbar region and had positive moderate to severe findings on the left. Lumbar x-ray showed changes consistent with lateral fusion and posterior fusion with intact hardware and mild to moderate multilevel spondylosis and arthropathy.

(R. at 22–23) (internal citations omitted). The ALJ considered Gentry's spinal cord stimulator procedure, which gave her "at least 40 percent improvement with pain" and left her "very pleased and doing very well" and, by December 2020, she "reported the stimulator completely eliminated her pain when working properly." (R. at 23.) The ALJ reviewed Gentry's progress in 2019 and 2020, where she continued to have "normal gait and 5/5 muscle strength in all major muscle groups" even with some "decreased range of motion and tenderness to the cervical spine[,]" "bilateral ulnar sensory neuropathic change, right greater than left[,]" "tenderness and decreased range of motion on the neck[,]" and "hypersensitiv[ity] in the upper arms and decreased in the bilateral hands." (Id.)

> Regarding her joints, the ALJ found that Gentry:
>
> In late 2019, . . . complained of pain localized to one or more joints. In November 2019, she presented with left knee pain that had not been helped with injections or physical therapy. In December 2019, [Gentry] was treated for left knee chondromalacia of patellofemoral joint and synovitis and was status-post left knee arthroscopy with chondral debridement of patella and trochlea and partial synovectomy. In August 2020, she had no tenderness but had some crepitus in the patella femoral joint. Range of motion was normal, incisions healed, and she had proper sensation and reflexes. She

- 5 -

> had more patella femoral crepitus on the right than left knee but no tenderness and neurovascular was intact. Range of motion was normal and there was no effusion. Bilateral knee x-rays showed mild findings and she underwent injections in both knees and was referred to physical therapy. Examinations of the lower extremities showed no wasting, swelling, redness, or ecchymosis. Strength was 5/5, sensation intact, and range of motion full without pain. There was no edema, no tenderness to palpation, and straight leg raise was negative.
>
> An MRI in October 2020 showed mild patellofemoral arthropathy minimal fluid in Baker's recesses with tracking into the perivascular ganglion cyst. She underwent right knee arthroscopy with debridement of articular cartilage of patella and trochlea and partial synovectomy in October 2020. On follow-up in November 2020, examination was essentially normal. In May 2021, [Gentry] underwent robotic-assisted left knee patellofemoral unicompartmental arthroplasty.

(R. at 23–24) (internal citations omitted). The ALJ noted that "[o]n her most recent visits in June 2021, examination was essentially normal on bilateral knees with normal range of motion and gait. [Gentry] said her knee pain had improved and she was doing well overall." (R. at 24.)

Regarding her shoulders, the ALJ found that Gentry:

> presented with left shoulder pain in December 2018 with decreased range of motion. She was treated with therapy, injections, and medications. MRI showed a complex labral tear with SLAP lesion. She had left shoulder surgery in August 2019. An MRI of the left shoulder in September 2020 showed mild findings and tendinosis but no tear. In October 2020, she reported minimal ongoing shoulder pain and remained neurovascularly intact.
>
> In August 2019, [Gentry] complained of right shoulder pain and MRI demonstrated right shoulder partial thickness rotator cuff tear, SLAP lesion, and biceps tendinitis. She underwent right shoulder debridement of rotator cuff and labrum and biceps tenodesis,

- 6 -

>     arthroscopic. On follow-up in October 2019, motion was
>     smooth and wounds clean and dry. She was to continue to
>     advance in therapy. By November 2019, she was doing much
>     better. She had no pain on full range of motion and no
>     grinding or crepitus. She was to resume activities as
>     tolerated avoiding heavy lifting. In August 2020, the
>     right shoulder was not tender, and no instability was
>     noted. She had full range of motion and normal strength.
>     Recent examinations showed muscle strength was 5/5 in
>     all major muscle groups.

(Id.) (internal citations omitted). The ALJ also considered that Gentry has been diagnosed with obesity, and how this condition may affect her other impairments. (Id.)

The ALJ also considered the findings of the state agency medical consultants, who determined Gentry "could perform light work with postural, manipulative, and environmental limitations." (R. at 25.) The ALJ found the opinion persuasive, "[h]owever, evidence received at the hearing level supports a sit/stand option and additional hazard precautions due to objective findings on the back and joints, pain, and obesity" and "[h]er overhead reaching is limited bilaterally based on recent records regarding pain reported in both upper extremities." (Id.) Nonetheless, the ALJ concluded that Gentry's "limitations do not preclude all work activity." (Id.) The ALJ finally considered the findings of the state agency psychological consultants, finding persuasive their opinion that Gentry's "mental impairments were not severe in that they caused no more than mild limitations." (Id.) After reviewing "the objective medical evidence, the medical opinion evidence, and

[Gentry's] daily activities[,]" the ALJ concluded that Gentry could perform light work with limitations, even though she had "she is unable to perform work . . . ." (Id.)

At the fourth step, the ALJ determined that Gentry was "unable to perform any past relevant work." (Id.) In making the finding, the ALJ relied on testimony from the vocational expert ("VE"), who explained that Gentry's former work as a dancer required heavy exertion, which she is no longer capable of based on her RFC. (Id.) At the fifth step, the ALJ concluded that, given Gentry's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." (R. at 26.) At the hearing, the VE testified that, even given the limitations in her RFC, Gentry could perform the jobs "hand packer," "production assembler," or "production worker," each of which the VE testified represents at least 36,000 jobs in the national economy when accounting for a sit/stand option every thirty minutes. (Id.) The ALJ found "that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. Additionally, the vocational expert also based her testimony on her education and many years of experience, which the undersigned finds acceptable." (Id.) The ALJ concluded that, because there are jobs that exist in significant numbers in the national economy

that Gentry can perform, a "finding of 'not disabled' is therefore appropriate . . . ." (R. at 27.)

On September 29, 2021, the ALJ issued a decision detailing the findings summarized above. The Appeals Council denied Gentry's request for review. (R. at 1.) Gentry now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner under § 1631(c)(3) of the Act. On appeal, Gentry argues that the ALJ incorrectly evaluated her RFC and erred in determining that jobs exist in significant numbers in the national economy that Gentry can perform.

## II. ANALYSIS

### A. Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of

Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the

testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

**B.   The Five-Step Analysis**

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Id. § 423(d)(2). Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born

- 11 -

v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to social security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See id. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See id. §§ 404.1520(a)(4)(iv), 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of "not disabled" must be entered. Id. But if

the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See id. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. Id. § 404.1520(a)(4).

**C.  Gentry's RFC**

Gentry argues that the ALJ's determination that she is capable of doing light work with a sit/stand option every thirty minutes and additional limitations is not supported by substantial evidence. (ECF No. 15 at PageID 1444.)[2] To support her contention, Gentry first argues that the ALJ erred by deciding that Gentry's sit/stand option "only needs to be exercised every thirty minutes[,]" which she argues is not supported by any medical evidence. In her testimony before the ALJ, Gentry and the government attorney had the following exchange:

> Attorney: So how long can you stay in one position before you need to switch to another?
>
> Gentry: Probably 10, 15 minutes and then I'm moving it back.

---

[2]The government argues separately that Gentry waived her arguments related to her RFC. (ECF No. 18 at PageID 1465.) The undersigned agrees with Gentry's Reply, (ECF No. 19 at PageID 1474), that she sufficiently raised the issue of whether the RFC is supported by substantial evidence.

> Attorney: Okay, so about 10 or 15 minutes and you have to move from sitting to standing --
>
> Gentry: Or even if I'm laying I need to lay in a different position.

(R. at 49.) There is no other evidence in Gentry's medical record or the state agency medical consultants' report that directly aligns with or refutes this assertion. The ALJ and the VE had the following exchange regarding a potential sit/stand option:

> ALJ: If the individual needed a sit/stand option let's say every 30 minutes or so, how would that impact these jobs?
>
> VE: What I would do at that point based on my education and experience in the field would be to reduce those numbers by quite a bit, probably about 50 percent to afford for that --
> . . .
>
> ALJ: Okay. What if we -- well, what if the sit/stand option was every 15 minutes how would that impact work activity?
>
> VE: You know, that would eliminate the work at that point. The jobs would dwindle. If you're having to change positions really 30 minutes is my maximum. So if you start going under that time frame, especially for 15 minutes, that's going to eliminate a person's ability to do competitive work at that point.
>
> ALJ: Okay. So anything less than 30 minutes, if it's 40 minutes even --
>
> VE: Right
>
> ALJ: Okay. So that --
>
> VE: Exactly.
>
> ALJ: -- frequency of changing positions would take you off task, I guess, enough that you're going to --

- 14 -

>VE: Right.
>
>ALJ: -- there's not going to be any jobs?
>
>VE: Exactly. Yes.

(R. at 56–57.) Gentry appears to argue that, based on this exchange, the ALJ first decided that Gentry was able to work and then tailored the RFC to ensure that result. (ECF No. 15 at PageID 1451.) The government responds that it was Gentry's burden to provide evidence of her need for a sit/stand option more frequently than every thirty minutes, yet her only proof was her statement during the hearing. (ECF No. 18 at PageID 1466.) According to the government, "The ALJ's RFC reflects that he gave [Gentry] the benefit of the doubt . . . given the evidence . . . showing relatively normal clinical findings related to sitting, standing, and general mobility." (Id.)

The undersigned acknowledges first that this is an unusual circumstance. Far more typically, the state medical consultants make findings suggesting additional limitations that the ALJ rejects, which the appellant then seeks to challenge for not being supported by substantial evidence. Here, the ALJ found an additional limitation not previously discussed by the consultants. The ALJ undoubtedly has the authority to do so if the choice made is supported by substantial evidence in the record. Here, the ALJ explains only that "evidence received at the hearing level supports a sit/stand option[,]" leaving somewhat unclear how and why the

ALJ came to the conclusion that (1) a sit/stand option is necessary and (2) the appropriate time for the sit/stand option is thirty minutes. (R. at 25.) However, this court's responsibility on appeal is only to evaluate whether substantial evidence supports the ALJ's decision. In this case, it does. There are dozens of instances in the record demonstrating Gentry's ability to stand and walk relatively normally, even though she sometimes used an assistive device or had a limp, especially shortly after a medical procedure. (R. at 370, 401, 464, 490, 514, 532, 542, 548, 553, 557, 562, 567, 572, 582, 587, 592, 597, 602, 607, 612, 617, 622, 626, 631, 635, 640, 645, 649, 675, 913, 927, 954, 1037, 1175, 1264, 1272, 1279, 1287, 1295, 1308, 1318, 1322, 1326, 1330, 1350, 1352, 1355, 1374, 1376, 1379, 1381). Gentry did not provide evidence, beyond her testimony, to support the notion that she required a sit/stand option more frequently than every thirty minutes. The ALJ did not err by finding her statements only partially persuasive in reaching his conclusion as to her RFC.

Gentry next argues that the ALJ erred in the RFC determination because he found that Gentry's RFC permitted "only occasional overhead reaching," whereas the state medical consultants call for "limited" right overhead reaching. (ECF No. 15 at PageID 1449–50) (citing R. at 55, 82, 103–04, 120). Gentry "challenges the ALJ proffering no explanation for disregarding her exertional limitation rating of, 'limited,' for this more generous rating of,

- 16 -

'occasionally.'" (Id. at PageID 1450.) However, the ALJ need not adopt the opinions of the medical consultants verbatim. See, e.g., Daniels v. Comm'r of Soc. Sec., No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020); Hogan v. Comm'r of Soc. Sec., No. 1:20-cv-01311, 2021 WL 4477786, at *4 (N.D. Ohio, September 30, 2021). Substantial evidence supports the ALJ's conclusion regarding Gentry's ability to reach overhead. The ALJ discussed Gentry's conditions in both shoulders and factored in her medical procedures. (R. at 24.) As previously noted, the ALJ found that:

> [Gentry] presented with left shoulder pain in December 2018 with decreased range of motion. She was treated with therapy, injections, and medications. MRI showed a complex labral tear with SLAP lesion. She had left shoulder surgery in August 2019. An MRI of the left shoulder in September 2020 showed mild findings and tendinosis but no tear. In October 2020, she reported minimal ongoing shoulder pain and remained neurovascularly intact.
>
> In August 2019, [Gentry] complained of right shoulder pain and MRI demonstrated right shoulder partial thickness rotator cuff tear, SLAP lesion, and biceps tendinitis. She underwent right shoulder debridement of rotator cuff and labrum and biceps tenodesis, arthroscopic. On follow-up in October 2019, motion was smooth and wounds clean and dry. She was to continue to advance in therapy. By November 2019, she was doing much better. She had no pain on full range of motion and no grinding or crepitus. She was to resume activities as tolerated avoiding heavy lifting. In August 2020, the right shoulder was not tender, and no instability was noted. She had full range of motion and normal strength. Recent examinations showed muscle strength was 5/5 in all major muscle groups.

(Id.) (internal citations omitted). Based on this record, there is more than enough evidence to support the finding that Gentry

retains enough strength and mobility in her shoulders for "occasional overhead reaching" regardless of the findings of the state medical consultants.

**D.   Step Five Evaluation**

At step five, "the burden shifts to the Commissioner . . . to show 'a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . and vocational profile.'" Kyle v. Comm'r of Soc. Sec., 609 F.3d 847, 855 (6th Cir. 2010) (quoting McGlothin v. Comm'r of Soc. Sec., 299 F. App'x 516, 522 (6th Cir. 2008)). "To meet the burden, the Commissioner must prove that the claimant has the vocational qualifications to perform specific jobs and may rely on a vocational expert's testimony in response to a hypothetical question about the claimant's impairments and abilities." O'Neal v. Comm'r of Soc. Sec., 799 F. App'x 313, 316 (6th Cir. 2020) (citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 238 (6th Cir. 2002)).

According to the VE's hearing testimony, there were a total of 552,000 jobs available across three job categories Gentry could do; though she estimated it would have to be reduced by about half to account for Plaintiff's need for a sit/stand option, leaving about 270,000 jobs in the national economy (R. at 26, 56). Gentry argues that the VE vastly overstated this number. (ECF No. 15 at PageID 1453.) Specifically, she cites to her own attorney's searches on "SkillTRAN Job Browser Pro" apparently resulting in a

finding of 3,944 jobs in the national economy, halved to 1,972 available with a sit/stand option. (Id.) (citing, in part, to Gentry's brief to the Social Security Administration Appeals Council, in which she lowered 3,944 to 3,046 jobs, having removed the part-time positions). These calculations are irrelevant because this court is limited only to the record before the ALJ. See Williams v. Comm'r of Soc. Sec., No. 1:20-CV-11567, 2021 WL 3524115, at *9 (E.D. Mich. June 23, 2021), report and recommendation adopted sub nom. Williams v. Kijakazi, No. 1:20-CV-11567, 2021 WL 3205001 (E.D. Mich. July 29, 2021) (Williams's SkillTRAN "research was not presented as evidence during or prior to the hearing, and neither the VE nor the ALJ had an opportunity to consider it. As such, the 30,000-job figure provided by the VE and relied upon by the ALJ remains unchallenged.").

Further, VE testimony can, and frequently does, mark the basis for a reasonable step five determination by an ALJ. See Moats v. Comm'r of Soc. Sec., 42 F.4th 558, 562 (6th Cir. 2022) ("[T]he vocational expert's testimony at [the claimant's] hearing amounted to substantial evidence supporting the ALJ's decision."). When the VE's testimony relies on extensive personal experience as well as citation to the Dictionary of Occupational Titles ("DOT"), these "twin considerations bolster the value of the expert's testimony as well as the ALJ's decision to rely on" it. Id. at 562-63. Here, the VE leaned on her education and experience — which includes

- 19 -

nearly twenty-five years as a Vocational Rehabilitation Specialist and a master's degree in rehabilitation counseling — to reach her conclusions. (R. at 56—59, 345.) The VE also relied on the DOT to make her initial estimates for the different jobs Gentry could perform. (R. at 56—58.) The undersigned finds that the ALJ's reliance on the VE's testimony was reasonable, and her resulting decision finding Gentry not disabled finds substantial support in the record.

### III. CONCLUSION

For the reasons above, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

December 14, 2023
Date